**IN RE ASACOL ANTITRUST LITIGATION**

Civil Action No. 15–cv–12730–DJC

United States District Court, D. Massachusetts.

Signed February 10, 2017

## MEMORANDUM AND ORDER

CASPER, United States District Judge

### I. Introduction

Ahold USA, Inc. ("Ahold"), Meijer, Inc. and Meijer Distribution, Inc. (collectively, "Meijer"), Rochester Drug Co–Operative, Inc. ("RDC") and Value Drug Company ("Value Drug") (collectively, the "Direct Purchasers") bring this antitrust class action on behalf of themselves and all others similarly situated against Defendants Warner Chilcott Limited, Warner Chilcott (US) LLC, Warner Chilcott Sales (US) and Warner Chilcott Co., LLC (collectively, "Warner Chilcott"), Allergan plc, Aller-

gan, Inc., Allergan USA, Inc. and Allergan Sales, LLC (collectively, "Allergan"). Plaintiffs allege that these entities engaged in an anticompetitive scheme that included product hopping that constituted monopolization in violation of Section 2 of the Sherman Act (Count I), attempted monopolization in violation of Section 2 of the Sherman Act (Count II) and product hop monopolization in violation of Section 2 of the Sherman Act (Count III). Warner Chilcott (US) LLC, Warner Chilcott Sales (US), LLC, Warner Chilcott Co., LLC, Allergan USA, Inc. and Allergan Sales, LLC (collectively, the "Defendants") move to dismiss (1) the reverse payment allegations in Counts I and II with respect to the patent settlement agreement between Warner Chilcott and Zydus Pharmaceuticals ("Zydus") and (2) the product hopping claims in Counts I, II and III with respect to the introduction of Asacol HD.[1] D. 171. The Court **GRANTS** in part and **DENIES** in part the Defendants' motion to dismiss.

### II. Standard of Review

The Court will grant a Rule 12(b)(6) motion to dismiss if the complaint fails to plead sufficient facts to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). To determine whether the complaint has done so, the Court must conduct a two-step, context-specific inquiry. García–Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013). It must first distinguish the factual allegations from the conclusory legal allegations, accepting only the factual allegations as true for purposes of the motion to dismiss. Id. (citing Morales–Cruz v. Univ. of P.R., 676 F.3d 220,

---

1. The Defendants assert that the Direct Purchasers have not yet served or alleged service on Allergen Inc. and have not met the requirements under the Hague Convention for service onto Allergan plc and Warner Chilcott

Limited, which are both incorporated outside of the United States. See D. 172 at 7 n.1. The Direct Purchasers do not respond to this assertion in their opposition. See D. 193.

224 (1st Cir. 2012)). Second, the Court must decide whether the factual allegations "plausibly narrate a claim for relief." Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012) (citing Ocasio–Hernández v. Fortuño–Burset, 640 F.3d 1, 7, 11–13 (1st Cir. 2011)). "In determining whether a [pleading] crosses the plausibility threshold, 'the reviewing court [must] draw on its judicial experience and common sense.'" García–Catalán, 734 F.3d at 103 (second alteration in original) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 679, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). "[N]o single allegation need [establish] ... some necessary element [of the cause of action], provided that, in sum, the allegations ... make the claim as a whole at least plausible." Garayalde–Rijos v. Municipality of Carolina, 747 F.3d 15, 24 (1st Cir. 2014) (alterations in original) (quoting Ocasio–Hernández, 640 F.3d at 14–15).

"In antitrust cases, 'dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.'" Meijer, Inc. v. Ranbaxy Inc., No. 15-cv-11828–NMG, 2016 WL 4697331, at *8 (D. Mass. Sept. 7, 2016) (quoting Hosp. Bldg. Co. v. Trustees of Rex Hosp., 425 U.S. 738, 746, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976)).

### III. The Hatch–Waxman Regulatory Background

In 1984, Congress enacted the Drug Price Competition and Patent Term Restoration Act of 1984—commonly referred to as the Hatch–Waxman Act—to promote the availability of lower price generic alternatives. In re Loestrin 24 Fe Antitrust Litig., 814 F.3d 538, 542 (1st Cir. 2016). There are four key features of the Hatch–Waxman regulatory framework. FTC v. Actavis, —— U.S. ——, 133 S.Ct. 2223, 2227–29, 186 L.Ed.2d 343 (2013); Loestrin, 814 F.3d at 542–43. First, a

brand–name drug manufacturer must submit a New Drug Application ("NDA") to the Food and Drug Administration ("FDA") to undergo an approval process prior to marketing a new prescription drug. Loestrin, 814 F.3d at 542–43 (citing 21 U.S.C. § 355(b)(1); Actavis, 133 S.Ct. at 2228). Second, the Act "promotes the availability of cheaper generic alternatives by allowing generic drug manufacturers to bypass certain aspects of the NDA process." Id. at 543. Instead, the generic manufacturer files an Abbreviated New Drug Application ("ANDA") that "must show that the generic drug contains the same active ingredients, route of administration, dosage form, and strength as the brand-name drug, as well as demonstrate that the generic and brand-name drugs are bioequivalent." In re Nexium (Esomeprazole) Antitrust Litig., 968 F.Supp.2d 367, 378 (D. Mass. 2013) (citing 21 U.S.C. § 355(j)(2)(A)(ii)–(iv)).

Third, the Act provides that the generic manufacturer must certify that it will not infringe on any of the brand name drug manufacturer's patents, which the generic manufacturer makes via one of four different certifications. Loestrin, 814 F.3d at 543 (citing 21 U.S.C. § 355(b)(1); Actavis, 133 S.Ct. at 2228). One way that a generic manufacturer can do so is via the "Paragraph IV route" in which the generic manufacturer can certify that any of the listed patents relevant to the brand-name drug are either invalid or will not be infringed upon by the generic manufacturer. Id. (citing Actavis, 133 S.Ct. at 2228) Fourth, and finally, the Hatch–Waxman Act encourages first-to-file ANDA generic manufacturers when they utilize the Paragraph IV route by providing that generic manufacturer with a 180-day period of exclusivity during which time no other generic manufacturers can compete with the brand-name drug. Id. (citations omitted).

During this period, "the FDA is disallowed from approving ANDAs from competing generic manufacturers for the same drug." Nexium, 968 F.Supp.2d at 379. Certainly, "the generic manufacturer may still face competition from a generic version of the drug produced by the brand manufacturer," otherwise known as an authorized generic ("AG"), both during and after the exclusivity period. Loestrin, 814 F.3d at 543. That is, because the brand-name manufacturer has already obtained FDA approval to sell the brand-name drug, they are also free to market their brand-name drug under a generic label before, during and after the 180-day exclusivity period. Nexium, 968 F.Supp.2d at 379 (citing Sanofi–Aventis v. Apotex Inc., 659 F.3d 1171, 1175 (Fed. Cir. 2011)).

## IV. Factual Background

Unless otherwise noted, the following factual summary is based upon the factual allegations in the amended complaint, D. 129, and are accepted as true for the consideration of the Defendants' motion to dismiss.

### A. Asacol, Asacol HD and Delzicol

Ulcerative colitis is a chronic inflammatory bowel disorder which can increase the risk of colorectal cancer if gone untreated. D. 129 ¶ 136. The disorder generally manifests in two cyclical phases which requires two modes of treatment: one treatment for currently active ulcerative flares and one for maintenance of remission treatment (treatment to prevent such flares from returning). Id. ¶¶ 137–38. The most common treatment for the disorder is a class of drugs containing the active ingredient mesalamine. Id. ¶ 139. Asacol and later developed Asacol HD and Delzicol are all mesalamine-based drugs that help to treat ulcerative colitis. Id. ¶¶ 142–43, 151–52, 179–80.

Under the Federal Food, Drug and Cosmetic Act ("FDCA"), a manufacturer of a new drug must obtain approval from the FDA to sell the drug in the United States. Id. ¶ 57. The manufacturer does so by submitting an NDA to the FDA, demonstrating that the drug is safe and effective and identifying any patents claimed to cover the new drug. Id. ¶¶ 57–58. When the FDA approves a new drug, it approves the drug for specific indications, meaning it approves the drug for treating particular ailments or symptoms. Id. ¶ 59. Within thirty days of FDA approval, the drug manufacturer may list any patents that cover the drug in the FDA's "Orange Book," which includes all FDA–approved prescription drugs, their approved generic equivalents and any patents that purportedly protect each drug. Id. ¶¶ 60, 117.

In January 1992, the FDA approved Asacol, a delayed-release oral tablet containing 400 mg of mesalamine to treat mild to moderately active ulcerative colitis. Id. ¶¶ 142–43. In August 1997, five years later, the FDA additionally approved Asacol for the maintenance of the remission of ulcerative colitis. Id. ¶ 142. The Orange Book lists both U.S. Patent Nos. 5,541,170 (the " '170 patent") and 5,541,171 (the " '171 patent") as covering Asacol, but neither patent claimed the active ingredient mesalamine. Id. ¶¶ 144–45. By 2004, Asacol became one of the top 100 best-selling pharmaceuticals in the United States that year, with approximately $322 million in sales. Id. ¶ 148.

In May 2008, the FDA approved Asacol HD, an 800 mg, long-acting mesalamine tablet, to treat moderately active ulcerative colitis. Id. ¶¶ 151–52. Asacol HD was approved to treat moderately active ulcerative colitis, but was distinct from Asacol in that it was not additionally approved to treat mildly active ulcerative colitis or the maintenance of remission of ulcerative colitis. Id. ¶¶ 152. The Orange Book lists two patents for Asacol HD, U.S. Patent Nos.

6,893,662 and 8,580,302, which are set to expire on November 15, 2021. Id. ¶ 153.

In February 2013, the FDA approved Delzicol, a delayed-release oral tablet containing 400 mg of mesalamine. Id. ¶¶ 180–81. The Orange Book lists U.S. Patent No. 6,649,180 (the "'180 patent") for Delzicol, which expires on April 13, 2020. Id. ¶ 268.

### B. Anticompetitive Allegations

The Direct Purchasers allege that this case involves product hopping and a reverse payment settlement agreement, both of which were part of an anticompetitive scheme by the Defendants.

■■■■ Illegal product hopping—the introduction of a new product by a monopolist in combination with exclusionary conduct that either severely restricts the market's ambit or bars a substantial number of rivals—is anticompetitive. In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig., 64 F.Supp.3d 665, 679–80 (E.D. Pa. 2014). As explained in the Court's July 20, 2016 Order in this case, "conduct by a monopolist to perpetuate patent exclusivity through successive products" by means of "tweaking a brand-name drug to prevent pharmacists from substituting a generic equivalent" can constitute one form of anticompetitive product hopping. In re Asacol Antitrust Litig., No. 15–cv–12730–DJC, 2016 WL 4083333, at *8 (D. Mass. July 20, 2016) (quoting New York ex rel. Schneiderman v. Actavis PLC ("Namenda"), 787 F.3d 638, 643 (2d Cir. 2015)). A "hard switch"—removing the original drug from the market entirely right before patent expiration to deprive potential generic manufacturers a prescription base for their generic version of the now-removed drug—is a product hop. Namenda, 787 F.3d at 648.

■■■ An anticompetitive reverse payment occurs when a brand-name manufacturer who holds a patent induces a potential generic rival to delay or abandon its challenges to the patent and its entry into the market by providing some form of compensation. Actavis, 133 S.Ct. at 2227. Reverse payments raise concerns of anti-competition because the payments shield the brand-name drug from competition and reduce or eviscerate consumer choice for a lower priced product. Loestrin, 814 F.3d at 544.

#### 1. Promotion of Asacol HD

The Direct Purchasers allege that Warner Chilcott acquired Asacol and Asacol HD in October 2009. D. 129 ¶¶ 156–57. At that time, Asacol was the 75th top-selling drug in the U.S., with approximate sales of $490 million. Id. ¶ 157. With the '170 and '171 patents for Asacol set to expire in July 2013, Warner Chilcott took efforts to switch patients from Asacol to Asacol HD shortly after its 2009 acquisition of the two drugs. Id. ¶¶ 157–58, 161. They did so despite the fact that Asacol HD was only FDA–approved for treatment of moderately severe ulcerative colitis flares whereas the original Asacol treated three indications of ulcerative colitis (treatment of mild ulcerative colitis flares, treatment of moderately severe ulcerative colitis flares and maintenance of remission). Id. ¶¶ 161, 163–65. Warner Chilcott's efforts of marketing Asacol HD from late 2009 into 2013 successfully moved sales from Asacol to Asacol HD. Id. ¶ 176. For example, Asacol HD increased from accounting for 9% of Asacol's total franchise sales in 2010 to constituting 28% of the franchise sales in the next year, 2011, alone. Id. During this effort, both Asacol and Asacol HD remained on the market. Id. ¶¶ 161–78.

#### 2. The Hard Switch from Asacol to Delzicol

Despite Warner Chilcott's marketing campaign to switch Asacol patients to Asacol HD, sales of Asacol HD plateaued and remained at roughly one-fourth of the sales of Asacol by the end of 2012. Id.

¶ 177. Moreover, Warner Chilcott's sales data demonstrates that even if the company could have switched half of the remaining Asacol prescriptions to Asacol HD before the patent expiration in July 2013, it would still have lost hundreds of millions of dollars to generic competition. Id. ¶ 178.

In mid–2012, Warner Chilcott began designing and launching a prescription drug called Delzicol to replace its Asacol sales. Id. ¶ 179. In March 2013, Warner Chilcott began selling Delzicol. Id. ¶¶ 180, 215, 226. On April 1, 2013, Warner Chilcott discontinued selling Asacol altogether, id. ¶ 226, with the intended effect of stifling the ability of a generic drug manufacturers to convert Asacol's market share via the Hatch–Waxman regulatory framework. Id. ¶¶ 179, 200. Warner Chilcott's withdrawal of Asacol forced thousands of patients who depended on Asacol for treatment to switch to Asacol HD or Delzicol and eliminated the possibility that a generic product could be substituted automatically for an Asacol prescription. Id. ¶ 228.

The Direct Purchasers allege that Warner Chilcott manufactured Delzicol and conducted the hard switch from Asacol to Delzicol to thwart competition created by a generic version of Asacol. Id. ¶¶ 178–79, 192. In its application for FDA approval, Warner Chilcott identified two differences between Asacol and Delzicol: first, Delzicol contained dibutyle sebacate ("DBS") an inactive ingredient while Asacol contained the inactive dibutyl phthalate ("DBP") instead and second, Delzicol encased its tablet with a cellulose capsule. Id. ¶¶ 182, 197–98. Warner Chilcott also relied on clinical outcomes of Asacol to describe the clinical safety and efficacy of Delzicol. Id. ¶ 183. The FDA approved Delzicol based on its bioequivalence. Id. ¶ 184.

The Direct Purchasers first allege that Warner Chilcott's supposed concerns about the dangers of DBP in Asacol were pretexts to create Delzicol for anticompetitive reasons. Id. ¶¶ 186, 188, 189, 193, 199–200. The Direct Purchasers cite several pieces of evidence to suggest that Warner Chilcott was not truly concerned with the safety risks of DBP. First, Asacol HD contains more than twice the amount of DBP in Asacol, but Warner Chilcott continued to produce Asacol HD for market consumption well beyond 2013 and likely as late as 2016. Id. ¶ 201. Further, if Warner Chilcott had been concerned about DBP exposure for patients, it would not have taken extraordinary efforts, including aggressive marketing and kickbacks, to get patients to switch from Asacol to Asacol HD. Id. ¶ 203. Second, Warner Chilcott's foreign subsidiary continued to sell Asacol and Asacol HD containing DBP to Canadian patients instead of introducing DBP–free versions of the drugs to its Canadian market. Id. ¶ 202. Third, Warner Chilcott left DBP in Asacol for years and waited until the eve of patent expiration in 2013 to cite the need to remove DBP as a reason for removing Asacol from the market entirely. Id. ¶ 196. The Direct Purchasers also allege that, in addition to serving as pretext for the hard switch, Warner Chilcott's focus on safety concerns had independent anticompetitive effects. Id. ¶ 200. One potential consequence of Warner Chilcott discontinuing Asacol was that the FDA would declassify it as a Reference Listed Drug ("RLD"). Id. Under FDA regulations, if a drug is delisted as an RLD in part based on safety concerns, the FDA will not approve any ANDA based on that drug. Id. The Direct Purchasers contend that by discontinuing Asacol for purported safety reasons, Warner Chilcott discouraged generic manufacturers from pursuing ANDAs based on Asacol. Id.

The Direct Purchasers next allege that Warner Chilcott used Delzicol's outer cellulose capsule for anticompetitive ends: to make Asacol non-substitutable with Delzicol and effectively to extend patent protec-

tion over its Asacol products until 2020. Id. ¶ 214. Delzicol's cellulose capsule makes generic Asacol no longer a suitable substitute because it prevents generic Asacol from receiving AB–rating and being substituted under state substitution laws; the change in inactive ingredients from DBP to DBS alone would not have this effect. Id. ¶¶ 195, 197–98. In addition, Delzicol was approved based on its bioequivalence such that. the capsule does not make the overall product medically superior to Asacol. Id. ¶ 208. This is coupled with the alleged facts that (1) the capsule dissolves in stomach acid and thus provides no additional protection to the active ingredients in Asacol that treat ulcerative colitis and (2) the capsule was not necessary for Warner Chilcott to include DBS instead of DBP as the inactive ingredient in the coating of the tablet. Id. ¶¶ 209–210. The lack of medical necessity for the capsule is further supported by the allegation that Allergan currently sells a DBP–free 400 mg Asacol tablet without a cellulose capsule in the United Kingdom. Id. ¶ 210. Finally, patients have disliked the Delzicol capsule due to its increased size and so the Delzicol package advises patients who struggle to swallow the pill to simply remove the capsule and swallow the Asacol tablet inside. Id. ¶ 211. For these reasons, the Direct Purchasers assert that the Defendants used the capsule for monopolistic purposes. Id. ¶ 214.

The Direct Purchasers further allege that Warner Chilcott's hard switch prevented generic Asacol from launching because discontinuing Asacol eliminated a generic manufacturers' only cost-effective means of competing for Asacol sales. Id. ¶¶ 233–35. That is, Warner Chilcott knew that if it withdrew Asacol from the market before any generic ANDA was approved, a generic version of Asacol would likely never come to market because the prescription base would be eliminated and no cost-efficient means of competing for sales

would exist any longer. Id. ¶¶ 238–39. The Direct Purchasers further assert that if the hard switch from Asacol to Delzicol had not occurred, at least one generic version of Asacol would have entered the market in July 2013. Id. ¶¶ 241–49. The hard switch and Warner Chilcott's anticompetitive scheme generally, however, caused would-be generic manufacturers to abandon their Asacol ANDAs. Id. ¶¶ 250–57. Instead, Warner Chilcott's anticompetitive tactics succeeded in excluding would-be generic competitors from the only cost-efficient means of distributing their products. Id. ¶ 262.

### 3. Sham Litigation Relating to the '180 Patent for the Delzicol Capsule

As alleged, the Defendants also created a pretext to protect sales from competition from AB–rated generic versions of Delzicol. Id. ¶ 267. As mentioned, Warner Chilcott owns the '180 patent for the capsule used to make Delzicol and further purports to have an exclusive license to manufacture Delzicol under that patent until its expiration on April 13, 2020. Id. ¶¶ 268–70. Because the patent is for the capsule—and not for a drug substance or product—the Direct Purchasers assert that it should not have been listed in the Orange Book for the Delzicol product per the Hatch–Waxman regulatory framework. Id. ¶¶ 270–79. Despite the patent's ineligibility to be listed in the Orange Book, Warner Chilcott submitted the '180 patent to the FDA for listing, asserting that the patent claims the entire Delzicol drug product. Id. ¶ 280. As a result of the improper Orange Book listing, no generic manufacturer could submit an ANDA to the FDA seeking generic version approval without certifying either that the product would not be marketed in the United States until expiration of the patent (a Paragraph III certification) or that the '180 patent was invalid or would not be infringed by the proposed product (a Paragraph IV certification). Id. ¶¶ 281–82. The Direct Purchasers assert that

Warner Chilcott purposefully used the improper patent listing to serve as a regulatory predicate for it to obtain up to thirty-months protection from generic competition by filing sham lawsuits alleging infringement of the improperly listed '180 patent. Id. ¶ 283.

The Direct Purchasers provide two examples. First, in July 2015, Teva Pharmaceuticals ("Teva") submitted an ANDA application to the FDA, seeking to market a generic equivalent of Delzicol via Paragraph IV certification. Id. ¶ 284. The proposed Teva product did not use the narrow capsule formulation claimed in the '180 patent and instead used a different type of hard capsule. Id. ¶¶ 286–89. Instead of testing the proposed generic product to determine if the proposed capsule fit the narrow contours of the '180 patent first, and without otherwise investigating the claim, Warner Chilcott filed a patent infringement suit against Teva for the purpose of obtaining the thirty-month stay of FDA approval of the ANDA application. Id. ¶¶ 290–93. The Direct Purchasers assert that Warner Chilcott did this as an anticompetitive weapon to impair generic competition. Id. ¶ 296. Second, in September 2015, Mylan Pharmaceuticals, Inc. ("Mylan") submitted an ANDA application to the FDA, seeking approval of a generic Delzicol via certification under Paragraph IV. Id. ¶ 298. Warner Chilcott filed a patent suit against Mylan for infringement of the '180 patent, which the Direct Purchasers assert was motivated by a desire to obtain the automatic thirty-month FDA stay. Id. ¶ 299–306.

#### 4. The Settlement Agreement with Zydus and Allegations of a Large and Unjustified Reverse Payment

In September 2011, Zydus filed an ANDA seeking FDA permission to sell a generic version of Asacol HD pursuant to its Paragraph IV certification and stated that it intended to challenge the validity or applicability of the patents on Asacol HD. Id. ¶ 309. Because Zydus was the first Paragraph IV filer for Asacol HD, it qualified for the 180–day marketing exclusivity period under the Hatch–Waxman framework. Id. Thereafter, in November 2011, Warner Chilcott filed a patent infringement suit against Zydus, which triggered the Hatch–Waxman thirty–month stay of any approval of Zydus's product. Id. ¶ 310.

In December 2013, Warner Chilcott and Zydus announced a settlement agreement ("Agreement"). Under the terms of the Agreement, Zydus agreed to drop its patent challenge against Warner Chilcott. Id. ¶¶ 312, 314. In exchange, the Agreement provided that Zydus could elect one of two options with respect to generic manufacturing and marketing of Asacol HD. Id. ¶ 314. Under the first option, Zydus could enter the market with its own generic starting November 15, 2015 if Zydus received FDA approval of its ANDA. Id. ¶ 314. If Zydus elected this option, Zydus would be required to pay Warner Chilcott a 25% royalty of Zydus's net sales. Id. ¶ 316. In addition, Warner Chilcott would still have the option to supply an authorized Asacol HD generic to its affiliates during Zydus's marketing exclusivity period. Id. ¶ 315.

Under the second option, the no-authorized generic option ("no-AG"), Zydus would wait until after July 1, 2016 and launch an authorized generic provided by Warner Chilcott. Id. ¶ 314. If Zydus elected the second option, the Agreement provided that Warner Chilcott would be barred from supplying an authorized generic to another entity for two years. Id. ¶ 315. If, however, Zydus received FDA approval of its ANDA, its right to market a product supplied by Warner Chilcott would terminate automatically. Id. Under this second option, Zydus would be required to pay Warner Chilcott 75% of Zydus's profits. Id. ¶ 316.

The Direct Purchasers assert that the economic incentives of the Agreement strongly favored Zydus choosing the no–AG option because the lack of separate competition from a Warner Chilcott authorized generic would be more lucrative to Zydus than the alternative option. Id. ¶ 318. That is, the no–AG path would be more profitable to Zydus because it would give Zydus the ability not only to gain 180-day exclusivity from other generic competitors but also avoid competition from a Warner Chilcott authorized generic which would otherwise not be subjected to the 180-day exclusivity period. Id. ¶¶ 318-19. Under the first option, Zydus's estimated profits annualized would be $18.5 million whereas Zydus would accrue an estimated $101 million in profits under the no–AG option. Id. ¶¶ 321–325.

Zydus had little to no reason to pursue final approval of its ANDA to enter the market under the Agreement because the later-entry option was more profitable. Id. ¶ 327. Further, given that the more lucrative option would terminate upon FDA approval of the ANDA, Zydus's incentive was to delay approval. Id. The Direct Purchasers allege that the Agreement was an improper reverse payment settlement agreement. Id. ¶¶ 330–39. The Direct Purchasers assert that Warner Chilcott paid Zydus to advance its anticompetitive scheme and delay an Asacol HD generic to protect its monopoly profits on the drug. Id.

### 5. Citizen Petitions to Encumber Generic Entry

FDA petitions allow individuals or organizations to express concerns to the FDA about the legality, safety or efficacy of a proposed or existing pharmaceutical. Id. ¶ 341. The FDA must consider each petition, which can delay generic development and approval. Id. Warner Chilcott allegedly abused this petition process by submitting multiple FDA petitions to delay

generic competition and make it more difficult for other manufacturers to sell generic Asacol. Id. ¶¶ 340, 342.

In February 2010, Warner Chilcott submitted a petition to the FDA that requested that the FDA require generic Asacol applicants to submit comparative clinical endpoint studies, comparative in vitro dissolution test and comparative pharmacokinetic safety testing under fed and fasted conditions as a condition precedent for approval. Id. ¶ 343. Such requirements would have added millions of dollars to the cost of developing a generic Asacol as well as substantially delaying FDA approval of a generic version. Id. ¶ 344. Ultimately, the FDA denied Warner Chilcott's request. Id. ¶ 345. Then, in October 2012, Warner Chilcott submitted a second FDA petition. Id. ¶ 346. This time, Warner Chilcott requested that the FDA establish heightened bioequivalency requirements for generic competitors to Asacol and Asacol HD. Id. Again, the FDA denied this request. Id. ¶ 347.

## V. Procedural History

On September 13, 2016, the Direct Purchasers filed an amended consolidated class action complaint against the Defendants. D. 129. The Defendants have now filed this partial motion to dismiss, D. 171, requesting dismissal of the reverse payment allegations in Counts I and II and the product hopping claims as to the introduction of Asacol HD in Counts I, II and III, D. 172 at 5. The Court heard the parties on the motion and took it under advisement. D. 249.

## VI. Discussion

### A. The Direct Purchasers' Reverse Payment Claims

#### 1. The Direct Purchasers' "Overall Scheme"

The Direct Purchasers assert that the Court cannot consider the Defendants'

arguments for dismissal of the reverse payment allegations in Counts I and II surrounding the settlement agreement between Warner and Zydus because doing so would impermissibly excise the reverse payment claim from the overall monopolization scheme alleged in Count I and the attempted monopolization scheme alleged in Count II. D. 193 at 13. The Direct Purchasers further clarify that this is so because the Direct Purchasers do not seek independent anticompetitive liability for their reverse payment claim, but instead bring these allegations as "one aspect of an overall scheme." Id.

In antitrust cases in which a scheme is alleged, "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." Cont'l Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 698–99, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); see Am. Tobacco Co. v. United States, 328 U.S. 781, 809, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946). "It is the mix of various ingredients ... in a monopoly broth that produces the unsavory flavor." City of Mishawaka v. Am. Elec. Power Co., 616 F.2d 976, 986 (7th Cir. 1980). Meaning, "it would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect," City of Anaheim v. S. Cal. Edison Co., 955 F.2d 1373, 1376 (9th Cir. 1992), and instead "the courts must look to the monopolist's conduct taken as a whole." Abbott Labs. v. Teva Pharm. USA, Inc., 432 F.Supp.2d 408, 428 (D. Del. 2006). "If a plaintiff can allege that a series of actions, when viewed together, were taken in furtherance and as an integral part of a plan to violate the antitrust laws, that series of actions, as an overall scheme, may trigger antitrust liability." In re Gabapentin Patent Litig., 649 F.Supp.2d 340, 359 (D.N.J. 2009). As the Ninth Circuit cautions, however:

[a]t the same time, if all we are shown is a number of perfectly legal acts, it becomes much more difficult to find overall wrongdoing. Similarly, a finding of some slight wrongdoing in certain areas need not by itself add up to a violation. We are not dealing with a mathematical equation. We are dealing with what has been called the "synergistic effect" of the mixture of the elements.

City of Anaheim, 955 F.2d at 1376 (quoting City of Groton v. Conn. Light & Power Co., 662 F.2d 921, 929 (2d Cir. 1981)). The outcomes of other cases reflect these principles of considering individual components in light of the overall scheme. Compare In re Solodyn (Minocycline Hydrochloride) Antitrust Litig., 14–md–02503–DJC, 2015 WL 5458570, at *13 (D. Mass. Sept. 16, 2015) (dismissing overall monopolization scheme because every allegation independently failed to allege a plausible anticompetition claim) and Intergraph Corp. v. Intel Corp., 195 F.3d 1346, 1366–67 (Fed. Cir. 1999) (same), with Asacol, 2016 WL 4083333, at *11 (denying dismissal as to the citizen petition claims because while that conduct was immune from antitrust liability, it could still serve to illustrate the context and motive underlying the overall anticompetitive conduct). Thus, the Court may assess "the specific claims" while "ruminat[ing] upon the effect of combining those claims." City of Anaheim, 955 F.2d at 1376. Indeed, the Court can consider the individual aspects of the claim so long as it keeps the larger scope of the scheme in context.

a) The Large and Unjustified Payment

In considering the reverse payment allegations, the Court first addresses the Defendants' assertion that that the Direct Purchasers have failed to plead that the Defendants made any reverse payment to Zydus. D. 172 at 14–15.

Patent-related settlement agreements in which the patentee compensates the alleged infringer are known as reverse payments. Actavis, 133 S.Ct. at 2227. Reverse payments can violate federal antitrust laws. Id. This is because "[a]n unexplained large reverse payment itself would normally suggest that the patentee has serious doubts about the patent's survival" thereby "suggest[ing] that the payment's objective is to maintain supracompetitive prices to be shared among the patentee and the challenger rather than face what might have been a competitive market." Id. at 2236; see King Drug Co. of Florence, Inc. v. Smithkline Beecham Corp., 791 F.3d 388, 410 (3d Cir. 2015). That is, "a reverse payment, where large and unjustified, can bring with it the risk of significant anticompetitive effects." Actavis, 133 S.Ct. at 2237. "[T]he likelihood of a reverse payment bringing about anticompetitive effects depends upon its size, its scale in relation to the payor's anticipated future litigation costs, its independence from other services for which it might represent payment, and the lack of any other convincing justification" and "[t]he existence and degree of any anticompetitive consequence may also vary as among industries." Id. at 2237. Although Actavis centered on cash payments, non-monetary reverse payments are also subject to this same concern. See Loestrin, 814 F.3d at 542, 550–51 (noting that "settlement agreements are subject to federal antitrust scrutiny where they do not involve reverse payments in pure cash form"); King Drug, 791 F.3d at 405 (concluding that "consequences of [a] pay-for-delay may be as harmful as those resulting from reverse payments of cash"). As an initial matter, a plaintiff is required to plead that the re-

verse payment is large and unjustified to satisfy its initial burden of alleging anticompetitive effects. See Solodyn, 2015 WL 5458570, at *7.

The Defendants contend that the Direct Purchasers fail to allege an adequate reverse payment because even if Warner Chilcott provided a benefit to Zydus, the complaint fails to demonstrate that Warner Chilcott made a "sacrifice" of its own in so doing. D. 172 at 14. In sum, the Defendants assert that the reverse payment claim is deficient because the complaint does not allege an "out of pocket" expenses by Warner Chilcott.[2] Id. The Direct Purchasers' allegations, however, adequately assert that there was a transfer of value by Warner Chilcott that supports the allegation that this was an anticompetitive reverse payment. This is what the law requires. As explained in Actavis, a suspect reverse payment is one where "[t]he patentee and the challenger gain; the consumer loses." Actavis, 133 S.Ct. at 2235. The Supreme Court further explicated that an otherwise unexplained reverse payment may manifest itself as one where "the payment's objective is to maintain supracompetitive prices to be shared among the patentee and the challenger rather than face what might have been a competitive market—the very anticompetitive consequence that underlies the claim of antitrust unlawfulness." Id. at 2236. That is, Actavis provides that an alleged anticompetitive reverse payment can take the form of a profit-sharing scheme between the brand name manufacturer and the generic manufacturer in which the brand name manufacturer prevents the invalidation of a lucrative patent and an

2. As the Direct Purchasers correctly contend, D. 193 at 16 n.37, the Direct Purchasers need not show that the Defendants transferred large and unjustified cash transfers to Zydus so long as they adequately allege that there

was either some large and unjustified monetary or non-monetary reverse payment made by Warner Chilcott to Zydus. Loestrin, 814 F.3d at 542, 550–51; King Drug, 791 F.3d at 405.

otherwise competitive market is suppressed.

The Direct Purchasers in this case have adequately alleged such a scheme. They assert that Warner Chilcott and Zydus announced a December 2013 settlement agreement in which Zydus agreed to suspend its patent challenge in exchange for one of two options to sell a generic version of Asacol HD. D. 129 ¶¶ 312–14. Under the option selected, Zydus would wait until after July 1, 2016 and launch an authorized generic Asacol HD and Warner Chilcott would be barred from supplying an authorized generic for two years thereafter but would receive 75% of Zydus's generic Asacol profits. Id. ¶¶ 314–16. The Direct Purchasers estimate that this option provided Zydus with an estimated $101 million in profits after the deduction of Warner Chilcott's royalties. Id. ¶¶ 321–25. By the terms of the agreement under the option selected, then, Warner Chilcott benefited from the anticompetitive delay of generic entry into the Asacol market while transferring value to Zydus in the form of the ability to serve as Warner Chilcott's authorized generic manufacturer and thereby effectively ensuring an estimated $101 million in net profits to Zydus. Warner Chilcott retaining a 75% royalty rate on the authorized generic profits does not equate to Warner Chilcott transferring little to no value to Zydus. Indeed, effectively agreeing "to pay the [generic manufacturer] many millions of dollars … even though [the generic manufacturer] did not have any claim that the [brand manufacturer] was liable to them for damages" at that point is "unusual" and raises "concern that settlements taking this form tend to have significant adverse effects on competition." Actavis, 133 S.Ct. at 2231.

 As highlighted by the First Circuit, "antitrust scrutiny attaches … to other forms of reverse payment that induce the generic to abandon a patent chal-

lenge, which unreasonably eliminates competition at the expense of consumers," with the key focus on the consideration of the payment made. Loestrin, 814 F.3d at 550. Here, this much has been asserted by the Direct Purchasers. See supra. The First Circuit continued that "the value of a reverse payment is a key component in determining whether it is unlawful" in bringing about anticompetitive effects. Loestrin, 814 F.3d at 551. The court explained that plaintiffs need not "provide precise figures and calculations at the pleading stage," but instead must "allege facts sufficient to support the legal conclusion that the settlement at issue involves a large and unjustified reverse payment under Actavis." Id. at 552 (citation omitted). Again, the Direct Purchasers here have done so: in their pleading, they assert that Warner Chilcott effectively provided Zydus with a $101 million profit that it could not otherwise have obtained through the patent litigation itself while gaining continued delay in generic entry into the Asacol market in exchange. D. 193 at 14 n.36. As such, the Direct Purchasers have sufficiently alleged that a large and unjustified reverse payment occurred because Warner Chilcott provided Zydus with the value of the no–AG option under the settlement agreement.

The Defendants further contend that the Court should dismiss the reverse payment allegations because the Agreement does not involve a costly transfer of value by Warner Chilcott as Warner Chilcott received 75% of the profits generated under the no–AG option in the Agreement. D. 229 at 10–11. Meaning, even if Warner Chilcott did provide value to Zydus, the deal struck does not raise the specter of anticompetitive behavior because the expense to Warner Chilcott was not costly. First, Actavis and its progeny do not focus the reverse payment inquiry on the absolute cost to the brand name manufacturer but instead examine the size of the pay-

ment, the scale of the payment in relation to anticipated future litigation costs, the payment's independence from other services to be rendered and the lack of any other convincing justification. Actavis, 133 S.Ct. at 2237; Loestrin, 814 F.3d at 551; King Drug, 791 F.3d at 412. Even if this were a requirement, a no–AG option is generally deemed to be costly to the patentee, here Warner Chilcott. King Drug, 791 F.3d at 405. This is because "a brand's commitment not to produce an authorized generic means that it must give up the valuable right to capture profits in the new two-tiered market." Id. at 405 (citations omitted). Here, as alleged, Warner Chilcott gave up its rights to capture independent profits in a two-tiered market. Admittedly, this matter varies from other cases: Warner Chilcott received a 75% royalty rate of the authorized generic as opposed to agreeing to not produce an authorized generic and receiving no royalty rates. To the extent that the Defendants' argument centers on whether a 75% royalty rate was equivalent to fair market value, this is a fact-specific inquiry inappropriate for the motion to dismiss stage.

The Court acknowledges Warner Chilcott's contention that it had reasonable justifications for why it struck a particular deal with Zydus, which in turn would demonstrate that the reverse payment was not anticompetitive in nature. These considerations, however, do not merit partial dismissal of the Direct Purchasers' complaint that adequately alleges a large and unjustified reverse payment. Under the governing rule of reason, once the Direct Purchasers plausibly allege a large and unjustified reverse payment, the burden shifts to the Defendants to show that this was not a payment for delayed entry

or anticompetitive ends. Solodyn, 2015 WL 5458570, at *7. "Such justifications, as with any affirmative defense, cannot be resolved on a motion to dismiss unless the facts establishing the defense are clear on the face of the plaintiffs' complaint, which they are not in this case." Id. (citing Blackstone Realty LLC v. FDIC, 244 F.3d 193, 197 (1st Cir. 2001)); see Actavis, 133 S.Ct.at 2235–36; Solodyn, 2015 WL 5458570, at *10.

Thus, for present purposes, the Direct Purchasers have alleged a large and unjustified reverse payment.[3]

### b) Standing to Bring a Separate Reverse Payment Claim

The Defendants additionally assert that the Direct Purchasers do not have standing to bring their reverse payment allegations. D. 172 at 12–14.

Federal courts are constitutionally limited to deciding cases or controversies. Merrimon v. Unum Life Ins. Co. of Am., 758 F.3d 46, 52 (1st Cir. 2014). Accordingly, a plaintiff must establish that it has standing in federal court by demonstrating that his complaint alleges a case or controversy recognized under Article III of the Constitution. See Katz v. Pershing, LLC, 672 F.3d 64, 71 (1st Cir. 2012). To do so, "a plaintiff must establish … injury, causation, and redressability." Id. (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

For standing to bring an antitrust cause of action, the Court examines whether a plaintiff has standing by conducting "an analysis of prudential considerations aimed at preserving the effective enforcement of the antitrust laws." RSA

---

**3.** The Defendants also assert that dismissal is required for other reasons explained in the motion to dismiss filed against the End Payor Plaintiffs, D. 50 at 39–55. D. 172 at 15. The Court concludes that none of the arguments listed therein warrant dismissal here where the Direct Purchasers have sufficiently alleged a large and unjustified reverse payment.

Media, Inc. v. AK Media Grp., Inc., 260 F.3d 10, 13 (1st Cir. 2001) (quoting Serpa Corp. v. McWane, Inc., 199 F.3d 6, 9–10 (1st Cir. 1999)). The Court considers "(1) the causal connection between the alleged antitrust violation and harm to the plaintiff; (2) an improper motive; (3) the nature of the plaintiff's alleged injury and whether the injury was of a type that Congress sought to redress with the antitrust laws . . .; (4) the directness with which the alleged market restraint caused the asserted injury; (5) the speculative nature of the damages; and (6) the risk of duplicative recovery or complex apportionment of damages." RSA Media, 260 F.3d at 14. "[T]he absence of 'antitrust injury' will generally defeat standing." Sterling Merchandising, Inc. v. Nestle, S.A., 656 F.3d 112, 121 (1st Cir. 2011) (quoting RSA Media, 260 F.3d at 14).

▆▆ The Defendants contend that the Direct Purchasers lack standing to claim overcharges for Asacol HD because they have not established that the Agreement between Zydus and Warner was the but-for cause for the failure of the FDA–approval and the failure to launch a generic Asacol HD drug earlier than the licensed entry date of November 15, 2015. D. 172 at 13. When considering whether a plaintiff has standing to bring an antitrust action, the Court must consider whether "the defendant's conduct was the substantial cause of the injury." Bristol–Myers Squibb Co. v. Copley Pharm., Inc., 144 F.Supp.2d 21, 22 (D. Mass. 2000).

▆▆ The Asacol End Payors raised a similar reverse payment allegation in the second count of their complaint, which this Court rejected for lack of standing. D. 110. There, the Court explained that "Warner Chilcott and Zydus agreed that once the FDA approved Zydus's ANDA, Zydus could sell its own generic starting November 15, 2015" but "[t]o date, the FDA still has not approved Zydus's ANDA for an Asacol HD generic." Id. at 13. That is, the lack of FDA approval remained "the limiting factor" in Zydus's ability to bring its generic drug to market and the allegations were lacking because "had Zydus not settled, litigated until the end and won, Zydus still would have needed FDA approval to launch its drug." Id. at 14–15. The same is true here. The Direct Purchasers have not demonstrated that the agreement between Zydus and Warner was the but-for cause of the failure to launch a generic Asacol HD: again, the complaint alleges no such FDA approval and no FDA approval for a generic Asacol HD application has been given as of the parties' filings. See D. 129 ¶¶ 307–339; D. 173–3 at 2.

This conclusion also comports with Solodyn. In Solodyn, the Court held that the lack of FDA approval for the generic product, not a settlement agreement between the alleged bad actors, was the limiting factor in the generic manufacturer's ability to bring the drug to market. Solodyn, 2015 WL 5458570, at *9. That is, "[w]ithout a plausible allegation of delay caused by Defendants, the direct purchasers have not alleged a cognizable antitrust injury." Id.; Bristol–Myers Squibb, 144 F.Supp.2d at 23 (dismissing antitrust counterclaim without prejudice because "[w]ithout tentative FDA approval, [counterclaim plaintiff] could not now enter the market, regardless of the pending [patent] litigation").

The Direct Purchasers' amended complaint includes additional allegations that the settlement agreement created financial incentives for Zydus to forgo FDA approval and instead become an authorized generic distributor for the Defendants. See D. 129 ¶¶ 319–326. When considering the End Payors' complaint, the Court explained that one of the reasons that the End Payors lacked standing was because "[t]hey have not offered plausible allegations that Warner Chilcott and Zydus

would have structured their settlement agreement so that Zydus would have come to market first as the seller of Warner [Chilcott]'s authorized generic as opposed to its own drug." D. 110 at 14. In their amended complaint at issue here, however, the Direct Purchasers allege that the financial incentives strongly favored Zydus choosing the no–AG path because that option provided Zydus with the ability to enjoy not only its 180–day exclusivity from other generic ANDA competitors but also from competition from a Warner Chilcott authorized generic and an estimated net profit of $101 million annually compared to an approximate $18.5 million annually under the alternative settlement option. D. 129 ¶¶ 319, 321–325. These allegations support the claim that Warner Chilcott and Zydus structured their deal such that Zydus would come to market first as a seller of Warner Chilcott's authorized generic. They do not, however, change the Court's conclusion as to standing here. This is because "had Zydus not settled, litigated until the end and won, Zydus still would have needed FDA approval to launch its drug." D. 110 at 13. Accordingly, the Direct Purchasers have not shown that they have standing to bring a separate reverse payment claim.

Although the Direct Purchasers have not demonstrated that they have standing to bring a separate reverse payment claim, their allegations in this regard may still support their claims as to an overall monopolization scheme. That is, the Direct Purchasers may rely upon these allegations in its anticompetitive scheme allegations as to these Defendants "insofar as that evidence serves to illustrate the context and motive underlying the alleged anticompetitive conduct." D. 110 at 22 (quoting Steward Health Care Sys. LLC v. Blue Cross & Blue Shield of R.I., 997 F.Supp.2d 142, 163 (D.R.I. 2014)); see Abbott, 432 F.Supp.2d at 428. That is, even though the Direct Purchasers cannot claim

an antitrust injury as a result of the litigation settlement, it may provide background as to the overall anticompetitive scheme or at least as to the Defendants' recognition of impending generic competition. See City of Anaheim, 955 F.2d at 1376 (citing City of Groton, 662 F.2d at 929). Thus, the Direct Purchasers' lack of standing to bring a separate reverse payment claim— where they have otherwise alleged a sufficiently large and unjustified reverse payment—does not mandate that the reverse payment allegations in their anticompetitive scheme claims raised in Counts I and II be dismissed.

### B. The Direct Purchasers' Product Hop Claim as to Asacol HD

Section 2 of the Sherman Act "forbids monopolization, attempted monopolization, and conspiracies to monopolize any part of trade or commerce." Am. Steel Erectors v. Local Union No. 7, Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers, 815 F.3d 43, 60 (1st Cir. 2016) (citing 15 U.S.C. § 2). "The elements of monopolization are '(1) possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" Díaz Aviation Corp. v. Airport Aviation Servs., Inc., 716 F.3d 256, 265 (1st Cir. 2013) (quoting United States v. Grinnell Corp., 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966)). In the First Circuit, courts refer to "improper methods of acquiring or maintaining monopoly power as 'exclusionary conduct.'" Town of Concord v. Boston Edison Co., 915 F.2d 17, 21 (1st Cir. 1990). This means "conduct, other than competition on the merits or restraints reasonably 'necessary' to competition on the merits, that reasonably appears capable of making a significant contribution to creating or maintaining monopoly

power." Id. (quoting Barry Wright Corp. v. ITT Grinnell Corp., 724 F.2d 227, 230 (1st Cir. 1983)).

 By contrast, "[t]he elements of attempted monopolization are '(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.'" Diaz Aviation Corp., 716 F.3d at 265 (quoting Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993)). "Attempted monopolization, unlike monopolization, requires a finding of specific intent." Namenda, 787 F.3d at 651.

The Direct Purchasers allege that the Defendants "engaged in an exclusionary conduct scheme" which included "[e]ngaging in a hard switch product hop from Asacol to the HD and Delzicol versions" with the goal or purpose of maintaining or extending their monopoly power as to Asacol products. D. 129 ¶¶ 395–96; see id. ¶¶ 404–405, 409–410.

 The Direct Purchasers first assert that Counts I, II and III are all allegations based on the combined liability of the Defendants' introduction of both Asacol HD and Delzicol and the subsequent removal of Asacol from the market. D. 193 at 19. For this reason, the Direct Purchasers maintain that the Defendants' conduct as to Asacol HD from 2009 to 2013 cannot be separated from their conduct with the introduction of Delzicol for each of the three counts. Id. The Court agrees as to Counts I and II, the overall monopolization scheme and the attempted overall monopolization scheme counts. As the

Court explained above, a plaintiff may include evidence that, while not serving as an independent source of liability, helps to illustrate context and motive underlying the alleged anticompetitive conduct. See supra. Here, that is what the Direct Purchasers have done for Counts I and II, where they clarify that "[w]hile this complaint seeks to impose liability for actionable misconduct beginning around February 2013, the scheme began years earlier and so earlier acts set the context for later misconduct." D. 129 ¶ 5; see also D. 193 at 19.

Although the Court must keep in mind all of the factual components together when considering an antitrust scheme, the same is not true when considering the individual acts as separate antitrust violations. In Count III, the Direct Purchasers allege a violation of Section 2 of the Sherman Act for the product hop away from Asacol and to Asacol HD and Delzicol, respectively, "regardless of the overall scheme." D. 129 ¶¶ 409–10. Thus, whereas the Court considers the allegations related to Asacol HD while necessarily keeping in mind the monopolistic scheme as a whole for Counts I and II, the Court need not do the same for individual claims of antitrust liability. Thus, the Court can and will evaluate the Defendants' argument that the Direct Purchasers insufficiently pled a product hop with respect to Asacol HD in Count III.

 The Defendants first assert that the Direct Purchasers do not adequately plead a product hop claim based on a hard switch to Asacol HD because Asacol and Asacol HD were sold side-by-side.[4] D. 172 at 20. The Court agrees.

---

4. The Defendants only argue for dismissal as to Asacol HD. In so doing, the Defendants acknowledge that the Court's July 20, 2016 Order "declined to dismiss the [End Payor Plaintiffs'] product hopping claims" and in light of that Order, the Defendants did not move to dismiss all of the Direct Purchasers'

product hop claims. D. 172 at 5–7. Instead, the Defendants only move to dismiss the allegations as to Asacol HD because "the [c]omplaint admits that Defendants did not withdraw Asacol 400 when they launched Asacol HD and instead marketed the two concurrent-

"[N]either product withdrawal nor product improvement alone is anticompetitive." Namenda, 787 F.3d at 653–54. That is, product introduction alone "does not violate Section 2 even if it is performed by a monopolist and harms competitors as a result." Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP, 592 F.3d 991, 998–1000 (9th Cir. 2010). This is so even if an entity introduces a new product that cause delays in generic entry because Congress did not choose to so restrict name-brand drug manufacturers. Mylan Pharm. Inc. v. Warner Chilcott Pub. Ltd. Co. ("Doryx"), 838 F.3d 421, 440–41 (3d Cir. 2016). "[U]nless [a] plaintiff proves that some conduct of the monopolist associated with its introduction of a new and improved product design 'constitutes an anticompetitive abuse or leverage of monopoly power, or a predatory or exclusionary means of attempting to monopolize the relevant market'" there is no suspected anticompetitive conduct. Allied Orthopedic, 592 F.3d at 1000 (quoting Foremost Pro Color, Inc. v. Eastman Kodak Co., 703 F.2d 534, 545–46 (9th Cir. 1983), overruled on other grounds as recognized in Chroma Lighting v. GTE Prods. Corp., 111 F.3d 653, 657 (9th Cir. 1997)). "[W]hen a monopolist combines product withdrawal with some other conduct, the overall effect of which is to coerce consumers rather than persuade them on the merits and to impede competition, its actions are anticompetitive." Namenda, 787 F.3d at 653–54 (citing Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263, 274–75, 287 (2d Cir.1979)) (emphasis in original).

As the July 20, 2016 Order regarding the End Payors' claims explained, allegations as to the combination of the Defendants' withdrawal of Asacol and introduction of Delzicol in the context of generic

substitution laws subjects the Defendants to antitrust scrutiny. D. 110 at 15. The Direct Purchasers do not, however, allege a hard switch from Asacol to Asacol HD. Instead, the Direct Purchasers assert that Warner Chilcott took actions to switch patients from Asacol to Asacol HD after its 2009 acquisition of both drugs, D. 129 ¶¶ 157–58, 161, moving some sales revenue from Asacol to Asacol HD, id. ¶ 176. Still, the Direct Purchasers specifically allege that both Asacol and Asacol HD remained on the market throughout this period. Id. ¶¶ 161–78. Furthermore, the Direct Purchasers contend that Warner Chilcott switched its efforts to producing and selling Delzicol because its attempts to switch patients from Asacol to Asacol HD while both were on the market stagnated by the end of 2012. Id. ¶¶ 177–180, 226. Introducing Asacol HD without withdrawing Asacol from the market for several years is not a hard switch. Cf. Suboxone, 64 F.Supp.3d at 683 (explaining that the withdrawal of the drug created a reduction in consumer choice); Abbott, 432 F.Supp.2d at 424 (same). The allegation that the Defendants did not withdraw Asacol until after beginning to sell Delzicol—a different and substitutable drug to Asacol, unlike Asacol HD—further supports that the hard switch was not targeted towards Asacol HD but to Delzicol.

Other case law compels dismissal of the Asacol HD allegations raised here for this same reason. For instance, the court in Walgreen Co. v. AstraZeneca Pharm. L.P., 534 F.Supp.2d 146, 152–53 (D.D.C. 2008), dismissed a similar antitrust claim. There, the plaintiffs alleged that AstraZeneca engaged in exclusionary conduct by attempting to switch the market from the drug Prilosec (which had generic substitutes) to

---

ly for a period of several years" which is insufficient under Namenda and Doryx. Id. at 6–7.

Nexium (which did not) via aggressive marketing and promoting. Id. at 148, 150. The district court explained that product promotion is considered anticompetitive when "the defendants' offending conduct had to do with eliminating choices available to the consumer," not when the defendants' behavior merely added choices. Id. at 151; see Abbott, 432 F.Supp.2d at 421 (explaining that "[c]onsumers who are free to choose among various products enjoy the presence of competition rather than its absence"). That is, "[t]he fact that a new product siphoned off some of the sales from the old product ... does not create an antitrust cause of action" on its own. Walgreen Co., 534 F.Supp.2d at 152; see also Berkey Photo, 603 F.2d at 287 & n.39. Instead, because the Walgreen defendants maintained both products on the market, they did not interfere with other entities' freedom to compete in the generic market as a matter of law. Walgreen Co., 534 F.Supp.2d at 152. The same is true here as to Asacol HD.

The Direct Purchasers assert that even if there is no hard switch, the complaint still alleges a viable product hop from Asacol to Asacol HD because it details the Defendants' illegal attempts to market Asacol HD for off-label usage to reduce Asacol sales. D. 193 at 19–20. The Direct Purchasers argue that this illegal marketing constitutes coercion that interferes with the competitive process and is thus sufficient to state a product hop claim. Id. Namenda suggests otherwise. There, the Second Circuit explained that there is an important distinction between hard and soft switches. Namenda, 787 F.3d at 654–55. That is, soft switches do not have the same anticompetitive result because "the market can determine whether one product is superior to another ... 'so long as the free choice of consumers is preserved.'" Id. (quoting Berkey Photo, 603 F.2d at 287). Here, with respect to the relationship between Asacol and Asacol

HD, the Defendants preserved the freedom of consumer choice because both products remained on the market contemporaneously for four years. This freedom of choice is particularly evident from the complaint itself, which explains that consumer conversion from Asacol to Asacol HD stagnated by the end of 2012 and a share of consumers continued to choose Asacol over its high-dose counterpart despite the alleged marketing efforts by Warner Chilcott. D. 129 ¶¶ 176–178. Even if the Court were to consider the soft switch as a product hop—which it cannot because the soft switch left consumer choice intact—the allegations suggest that the alleged marketing conduct did not coerce customers because these consumers did not prefer Asacol HD over Asacol.

 For support, the Direct Purchasers rely on Doryx. There, the Third Circuit affirmed summary judgment on the basis that there was no anticompetitive claim in Doryx, but cautioned in dicta that it did "not rule out the possibility that certain insignificant design or formula changes, combined with other coercive conduct, could present a closer call with respect to establishing liability in future cases." Doryx, 838 F.3d at 438, 440. It continued that "courts may need to consider a number of additional, non-exhaustive factors" including "the unique separation between consumers and drug manufacturers in the pharmaceutical market, especially in cases where there is evidence of extreme coercion of physician prescribing decisions or blatant misrepresentation about a generic manufacturer's version of a drug" and "whether a so-called 'patent cliff' is indicative of anticompetitive conduct, especially when a defendant's actions are paid with weak or inconsistent evidence of precompetitive justifications." Id. at 440–41 & n.89. This is to say, however, that those considerations better inform

whether a hard switch occurred to assess whether the switch was anticompetitive in nature. Here, where no hard switch occurred from Asacol to Asacol HD, the Court cannot take into account these factors that inform whether a hard switch was monopolistic. Thus, as the Defendants assert, D. 172 at 21, allegations of a soft switch through marketing efforts cannot substitute for the key product withdrawal that undergirds a product-hopping claim.[5] See D. 110 at 15; see also Namenda, 787 F.3d at 653–54; Suboxone, 64 F.Supp.3d at 683. While the lack of a hard switch does not preclude the use of the Asacol HD marketing strategy in considering whether the Defendants engaged in an overall anticompetitive scheme in Counts I and II, see supra, it is insufficient pleading as to Asacol HD for the product hop claim in Count III.[6] For the foregoing reasons, the Court dismisses the Direct Purchasers' product hop claim as to Asacol HD in Count III. Count III remains with respect to the Direct Purchasers' claim of the hard switch to Delzicol.

## VII. Conclusion

For these reasons, the Court **GRANTS** in part and **DENIES** in part the Defendants' motion to dismiss, D. 171, as follows:

- The reverse payment allegations are not dismissed as to the overall scheme claims asserted in Counts I and II.
- The product hop claim as to Asacol HD in Count III only is DISMISSED. As to all other product hop claims, the motion is DENIED.

**So Ordered.**

---

[5] The Defendants further assert, D. 172 at 21, that even if this marketing could solely underpin a product hop claim, this marketing constitutes protected speech under the First Amendment. See, e.g., Sergeants Benevolent Ass'n Health & Welfare Fund v. Acta Vis, PLC, No. 15–cv–6549–CM, 2016 WL 4992690, at *11 (S.D.N.Y. Sept. 13, 2016) (explaining the interaction between antitrust violations and protected commercial speech). "[F]ederal courts are not to reach constitutional issues where alternative grounds for resolution are available." Vaquería Tres Monjitas, Inc. v. Pagan, 748 F.3d 21, 26 (1st Cir. 2014) (quoting ACLU v. U.S. Conference of Catholic Bishops, 705 F.3d 44, 52 (1st Cir. 2013)).

Since this Court dismisses Count III on alternative grounds, it need not reach this constitutional issue.

[6] Even if a hard switch were not necessary, the Direct Purchasers have still failed to allege claims to maintain that the introduction and promotion of Asacol HD was impermissibly anticompetitive. "To show that conduct has an anticompetitive effect," the Court considers "whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit." Abbott, 432 F.Supp.2d at 423. Here, for the reasons discussed above, the Direct Purchasers' allegations about Asacol HD have not done so.